❏ Original

**CLERK'S OFFICE**
**A TRUE COPY**
Apr. 12, 2021
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. **21-M-354 (SCD)** |
| Information that is stored at premises controlled by Google concerning Google Advertising ID or Google Account ID (GAID) #628252840811 | ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before     4-26-21     *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Honorable Stephen C. Dries     .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial) and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:     4-12-21 10:55 am           *s/ Stephen C. Dries*
                                                        *Judge's signature*

City and state:   Milwaukee, Wisconsin          Honorable Stephen C. Dries, U.S. Magistrate Judge
                                                        *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

## GRAND JURY MATTER NO. 2020R00324

### Property To Be Searched

This warrant is directed to Google LLC and applies to:

(1) Location History data and all geofence advertising location data associated with Google Advertising ID or Google Account ID (GAID) #628252840811 for the following time period:

from August 24, 2020 at 12:00 pm (CST) to August 25, 2020 at 6:00 am (CST)

## <u>ATTACHMENT B</u>

**I.  Information to be disclosed by Google**

The information described in Attachment A, via the following process:

1.  Google shall query location history data for GAID #628252840811 as described in

    Attachment A.  The location data should be sourced from information including GPS

    data, cellular data, and information about visible wi-fi points and Bluetooth beacons

    transmitted from devices associated with GAID #628252840811 during the following

    time period:

    from August 24, 2020 at 12:00 pm (CST) to August 25, 2020 at 6:00 am (CST)


2.  The location data should include latitudinal and longitudinal coordinates, dates, and

    times for GAID #628252840811 for the above referenced time period.



CLERK'S OFFICE
A TRUE COPY
Apr. 12, 2021
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| Information that is stored at premises controlled by Google concerning Google Advertising ID or Google Account ID (GAID) #628252840811 | ) |
| | ) |

Case No. **21-M-354 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2101, 844(n), 844(i), 2118(b), and 2118(d) | travel in interstate commerce with intent to riot, conspiracy to commit arson, arson of commercial property, burglary involving controlled substances, and conspiracy to commit burglary involving controlled substances |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Digitally signed by RICKY HANKINS
DN: c=US, o=U.S. Government, ou=Dept of Justice, ou=ATF, cn=RICKY HANKINS,
0.9.2342.19200300.100.1.1=15001001699456
Date: 2021.04.12 10:21:38 -05'00'

Ricky Hankins, Special Agent (ATF)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means).*

Date: 4-12-21

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

**GRAND JURY MATTER NO. 2020R00324**

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent of the United States Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

2.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy. That training included various legal courses related to constitutional law as well as search and seizure authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

3.      In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials. I am recertified annually as an ATF CFI. To date, I have participated in over 270 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,400 class hours of

fire related training. Furthermore, I have been an instructor regarding fire-related topics on 38 occasions for the following agencies and institutions: The National Fire Academy (FEMA), International Association of Arson Investigators Chapter 25, Waukesha County Technical College, and Blackhawk Technical College. I have also participated in over 200 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from August 2015 to August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

4.     As an ATF agent, I have been deployed to riots involving arsons, including the Sherman Park riots in 2016 and the Minnesota riots in 2020. I know from training and experience that individuals who commit crimes during riots commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media, including Facebook.

5.     I have previously applied for and received search and arrest warrants related to the crime of arson, as well as other crimes.

6.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.     Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of travel in interstate commerce or use of a facility of interstate commerce with intent to riot, in violation of Title 18, United States Code, Section 2101, conspiracy to commit arson, in violation of Title 18, United

States Code, Section 844(n), arson of commercial property, in violation of Title 18, United States Code, Section 844(i), burglary involving controlled substances, in violation of Title 18, United States Code, Section 2118(b), and conspiracy to commit burglary involving controlled substances, in violation of Title 18, United States Code, Section 2118(d).

## **BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY**

8.     Based on my training and experience, I know that cellular devices, such as mobile telephone(s), are wireless devices that enable their users to send or receive wire and/or electronic communications using the networks provided by cellular service providers.  Using cellular networks, users of many cellular devices can send and receive communications over the Internet.

9.     I also know that many devices, including but not limited to cellular devices, have the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi connectivity.  These devices can, in such cases, enable their users to send or receive wire and/or electronic communications via the wi-fi network.  A tablet such as an iPad is an example of a device that may not have cellular service but that could connect to the Internet via wi-fi.  Wi-fi access points, such as those created through the use of a router and offered in places like homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network.  In general, devices with wi-fi capability routinely scan their environment to determine what wi-fi access points are within range and will display the names of networks within range under the device's wi-fi settings.

10.     Based on my training and experience, I also know that many devices, including many cellular and mobile devices, feature Bluetooth functionality.  Bluetooth allows for short-range wireless connections between devices, such as between a device such as a cellular phone or tablet and Bluetooth-enabled headphones.  Bluetooth uses radio waves to allow the devices to

exchange information. When Bluetooth is enabled, a device routinely scans its environment to identify Bluetooth devices, which emit beacons that can be detected by devices within the Bluetooth device's transmission range, to which it might connect.

11. Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology. Using this technology, the device can determine its precise geographical coordinates. If permitted by the user, this information is often used by apps installed on a device as part of the apps' operation.

12. Based on my training and experience, I know Google is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Nearly every device using the Android operating system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

13. In addition, based on my training and experience, I know that Google offers numerous apps and online-based services, including messaging and calling (*e.g.,* Gmail, Hangouts, Duo, Voice), navigation (Maps), search engine (Google Search), and file creation, storage, and sharing (*e.g.*, Drive, Keep, Photos, and YouTube). Many of these services are accessible only to users who have signed-in to their Google accounts. An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address (*e.g.*, example@gmail.com). Other services, such as Maps and YouTube, can be used with limited functionality without the user being signed-in to a Google account.

14. Based on my training and experience, I also know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices. A user has the ability to sign-in to a Google account while using Chrome, which allows the user's

bookmarks, browsing history, and other settings to be uploaded to Google and then synced across the various devices on which the subscriber may use the Chrome browsing software, although Chrome can also be used without signing into a Google account. Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices and Windows computers, among others.

15.     Based on my training and experience, I know that, in the context of mobile devices, Google's cloud-based services can be accessed either via the device's Internet browser or via apps offered by Google that have been downloaded onto the device. Google apps exist for, and can be downloaded to, devices that do not run the Android operating system, such as Apple devices.

16.     According to my training and experience, as well as open-source materials published by Google, I know that Google offers accountholders a service called "Location History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain a record of the locations where Google calculated a device to be based on information transmitted to Google by the device. That Location History is stored on Google servers, and it is associated with the Google account that is associated with the device. Each accountholder may view their Location History and may delete all or part of it at any time.

17.     Based on my training and experience, I know that the location information collected by Google and stored within an account's Location History is derived from sources including GPS data and information about the wi-fi access points and Bluetooth beacons within range of the device. Google uses this information to calculate the device's estimated latitude and longitude, which varies in its accuracy depending on the source of the data. Google records the

margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

18.     Based on open-source materials published by Google and my training and experience, I know that Location History is not turned on by default. A Google accountholder must opt-in to Location History and must enable location reporting with respect to each specific device and application on which they use their Google account in order for that usage to be recorded in Location History. A Google accountholder can also prevent additional Location History records from being created at any time by turning off the Location History setting for their Google account or by disabling location reporting for a particular device or Google application. When Location History is enabled, however, Google collects and retains location data for each device with Location Services enabled, associates it with the relevant Google account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising. As noted above, the Google accountholder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google account or by enabling auto-deletion of their Location History records older than a set number of months.

19.     Location data, such as the location data in the possession of Google in the form of its users' Location Histories, can assist in a criminal investigation in various ways. As relevant here, I know based on my training and experience that Google has the ability to determine, based on location data collected and retained via the use of Google products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with. Among other things, this

information can indicate that a Google accountholder was near a given location at a time relevant to the criminal investigation by showing that his/her device reported being there.

20.     Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information.   Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, this information often provide clues to their identity, location, or illicit activities.

21.     Additionally, Google assigns a unique identifier to each Google subscriber for advertising and marketing purposes.  This unique advertising identifier is known as the Google advertising ID or Google Account ID (GAID). Google is capable of capturing location data for specific accounts through GAID that is independent of the Location History feature.  In fact, the GAID can capture location data even when the location services feature on a cellphone is disabled.

22.     Based on my training and experience, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (*i.e.,* session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other

log files that reflect usage of the account. In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

## **PROBABLE CAUSE**

23.     On August 23, 2020, Jacob Blake was shot multiple times by officers of the Kenosha Police Department. That incident triggered both non-violent protests and violent rioting, including numerous arsons throughout the City of Kenosha. The ATF subsequently deployed its National Response Team of arson investigators to Kenosha to process the fire scenes, collect video evidence, and identify potential suspects.

24.     On August 26, 2020, ATF and the Kenosha Police Department conducted a fire scene investigation at Charlie's 10th Hole bar, located at 3805 22nd Avenue, Kenosha, Wisconsin. Investigators located two areas of separate fire damage, one on the outside of the building and one on the inside.

25.     Investigators also collected hours of surveillance videos from multiple locations, including Charlie's 10th Hole bar. The following facts are distilled from relevant video surveillance footage reviewed by law enforcement as part of this investigation.

26.     On August 24, 2020, at approximately 11:25 pm, multiple people walked southbound on a sidewalk toward Charlie's 10th Hole bar, located at 3805 22nd Avenue, Kenosha, Wisconsin. At approximately 11:26 pm, a male wearing a dark sweatshirt with white lettering used an apparent ignitable liquid to set fire to the north exterior of the bar. At approximately 11:27 pm, this same group of people reacted to an unknown off-camera event by crouching and looking to the southwest. In response to that same event, a male in the group, who was wearing a dark hoodie, light shorts, white shoes, and a light colored facemask, removed a handgun from his waistband and fired two rounds toward the southwest. The male shooter walked with a distinct gait, as his toes pointed outward. Investigators later recovered spent 9mm ammunition casings on the ground near the area where the shooting had occurred, and the analysis of those casings is ongoing.

27.     At approximately 11:28 pm, an unknown subject from the same group threw a flaming object through the front window of Charlie's 10th Hole bar. At about this same time, some members of this group began to walk west, across 22nd Avenue, toward a CVS located at 3726 22nd Avenue.

28.     Approximately 14 people unlawfully entered that CVS store at approximately 11:30 pm on August 24, 2020.  The unlawful intruders included a heavyset black male wearing a dark facemask, backwards hat, and a red shirt with "Tom and Jerry" cartoon graphics, as depicted in Figure #1 below.  A second intruder was a male wearing a red shirt, light colored shorts, and a shirt covering his head, as depicted in Figure #2 below.  A third intruder was a black female with frizzy long hair, wearing black leggings and a light colored facemask, as depicted in Figure #3.  A fourth intruder was a white male wearing dark colored camouflage pattern shorts and shirt, depicted in Figure #4 below (alongside the heavyset black male in the "Tom and Jerry" shirt from Figure #1).  A fifth intruder was a male wearing a dark hoodie, light shorts, white shoes, and a light colored facemask (depicted below in Figure #5), which is consistent with the appearance of the individual who discharged a firearm outside Charlie's 10th Hole bar.  Other intruders inside the CVS (but not depicted here) included a black male wearing an orange shirt; a male wearing a yellow sweatshirt; and a suspect wearing a dark hoodie with white lettering that spelled "The Sanneh Foundation," which is a non-profit organization located in St. Paul, Minnesota.



*Figure 1 – Black male wearing Tom and Jerry graphic t-shirt inside CVS.*



*Figure 2 – Intruder wearing red shirt, light colored shorts*



*Figure 3 – Female intruder in CVS with frizzy hair*



*Figure 4 – White male wearing camouflage shorts and shirt*



*Figure 5 – Suspect from shooting outside Charlie's 10th Hole at CVS*

29.     The Kenosha Police Department responded to the CVS burglary and apprehended Jaquan Moore inside the store while other intruders fled.  Upon arrival, officers observed the bottom half of CVS's glass sliding doors were shattered and entered the building to check for

subjects. Multiple people fled, but officers were able to apprehend Moore, who was wearing a white t-shirt around his head and face to conceal his identity, along with a gray shirt and dark pants. Officers located a silver hammer with a black handle and a flathead screwdriver with a black-and-red handle in the immediate area around Moore. Officers noted that cash drawers and pill bottles were strewn across the floor, and the store was in disarray. The pharmacy section of the CVS had hundreds of pill bottles strewn across the floor, one shelf of medication was tipped over, and the medication refrigerators were opened. CVS pharmacy completed an inventory and found that $1,247.53 of controlled substances and $10,821.42 of non-controlled substances were missing from the store.

30.     For that crime, Moore was charged with burglary, in violation of Wisconsin Statute 943.10(1m)(a), the next day in Kenosha County Case No. 2020CF000973. According to publicly available court records, Moore's full name is Jaquan D. Moore, his date of birth is October 4, 1997, his phone number is (612) 802-8429, and his address is 1014 Rockefeller Lane, Unit 2, Madison, Wisconsin 53704.

31.     ATF later interviewed Moore twice, who eventually acknowledged that he had traveled with a group of people from the Twin Cities in Minnesota on August 24, 2020 to participate in "the riots" in Kenosha, Wisconsin. He said that he was standing next to the person who started the fire at Charlie's 10th Hole bar. Moore said that he left his cell phone in the vehicle of a person known to him as "George." Moore confirmed that the call number assigned to his cell phone is (612) 802-8429. Moore also said there were three vehicles that traveled together from Minnesota to Kenosha: a Dodge car, a white car, and a dark SUV. Moore said he was a passenger in the Dodge car.

32.     Law enforcement was able to locate a suspect Facebook account maintained by Moore: profile name "BackDooe Jq" [ID #100045960943538]. After reviewing publicly-available photos of the user/owner of this "BackDooe Jq" [ID #100045960943538] account, investigators who were personally familiar with Moore from multiple interviews with him concluded that they were the same person.

33.     During a subsequent canvass of Kenosha, investigators located additional surveillance video from the Stella Hotel located at 5706 8th Avenue, Kenosha, Wisconsin. Review of this surveillance video showed that a Dodge car, white sedan, and dark SUV parked in the area behind the hotel on August 24, 2020 at approximately 9:30 pm—consistent with Moore's statement.  Four individuals exited the Dodge car: two black males wearing pants; a white male wearing dark colored camouflage shirt and shorts; and a black male with long dreadlocks.  Four males also exited the white sedan.

34.     The most distinct footage was generated of the five individuals exiting the dark SUV.  This footage depicted a black female with frizzy hair exiting the rear passenger area of the dark SUV, depicted in Figure #6 below.  The footage also shows another female exiting from the dark SUV's backseat area (not depicted herein).  A heavyset black male can be seen exiting from the dark SUV's front passenger door, wearing a t-shirt with graphics similar to the aforementioned "Tom and Jerry" shirt, as depicted in Figure #7 below.  A black male with facial hair can be seen exiting the driver door of the dark SUV, wearing shorts, as depicted in Figure #8 below.  Finally, a thin, black male wearing a light colored facemask can be seen exiting the dark SUV's backseat, wearing light colored shorts and white shoes. This black male had long dreadlocks that extended down to approximately the middle of his back, and he is depicted below in Figures #9 and #10.  This same black male then can be

seen putting on a dark hoodie and walking away from the SUV, exhibiting a distinct gate with his toes pointed outward.



*Figure 6 – Rear passenger of dark SUV*



*Figure 7 – Front passenger of dark SUV*



*Figure 8 – Driver of dark SUV*





*Figures 9 and 10 - Black male with long dreads, light colored
shorts, white shoes that exited the backseat of the dark SUV*

35.     The dark SUV's license plate was later enhanced and found to be Nevada plate #798L96, which was assigned to a 2020 Nissan Pathfinder rental car owned by Hertz corporation.   According to records later obtained from Hertz, the Nissan Pathfinder was rented by Natasha Bennett at the Minneapolis International Airport on August 22, 2020 and returned on August 25, 2020.   Investigators initially believed Bennett was the black female depicted in Figure #6, but later determined the female in Figure #6 did not match the likeness of Bennett's Minnesota driver's license photograph.

36.     A query of people who have used Natasha Bennett's home address showed that Kannasysha Stevenson (DOB: 08/09/2001) had used the same address as Bennett. Investigators also located a video of Stevenson on Bennett's Facebook page ["Tasha Gotta Change" ID #100003313833644]. This video from Bennett's Facebook page showed Stevenson with frizzy hair on August 19, 2020, as depicted in the still below as Figure #11.

This same video from August 19, 2020 depicted Stevenson sitting in front of a birthday cake with "Happy Birthday Kannasysha" printed on the cake. Bennett "tagged" Stevenson in the Facebook posting related to this video using Stevenson's Facebook account name: "NayNay Macc" [Facebook ID #10000503917].



*Figure 7 – Stevenson shown in video on Natasha Bennett Facebook page*

37.     Investigators reviewed the publicly available list of Facebook friends of Stevenson's "NayNay Macc" Facebook account and noted that she was Facebook friends with a Facebook account bearing the username "La Dave Llbd" [Id #100046596046244]. "La Dave Llbd" was also a listed friend for Moore on Moore's Facebook account "BackDooe Jq" [ID #100045960943538].

38.     Furthermore, investigators observed that "La Dave Llbd" was Facebook friends with "Anthony Clay (Stack Bundles)" [ID #100009171689529], who is also a Facebook friend to Moore. Investigators had previously reviewed a recorded jail call placed

by Moore on August 25, 2020, in which Moore instructed the other party on the line to contact "Anthony Clay" via Facebook to retrieve Moore's belongings from Clay, including Moore's wallet, cellphone, and "scripts." Neither Moore's wallet nor cellphone were on his person at the time of his arrest inside the CVS. During another call, Moore said that he went into the CVS with others—that the others went in to steal Percocets, but he was the one who was caught. He admitted that he brought a screwdriver with him, but claimed he was unable to steal anything.

39.     While reviewing Stevenson's list of Facebook friends, investigators also identified an account with the profile name "Bullykapper Bubba" [ID #100051201276617]. "Bullykapper Bubba" was observed to be a black male with braided long hair as well as facial hair. "Bullykapper Bubba" was also a listed Facebook friend for "Anthony Clay (Stack Bundles)" [ID #100009171689529] and "La Dave Llbd" [ID #100046596046244].

40.     "Bullykapper Bubba" [ID #100051201276617] posted a Facebook live video on September 10, 2020, which depicted a traffic stop conducted by law enforcement. During the traffic stop, the user of the account is identified as "Allen" and a passenger in the vehicle named "Michael" is arrested for an outstanding warrant. Law enforcement contacted the Hennepin County Dispatch Center in Minnesota and provided them the date, time, and first names "Allen" and "Michael," requesting any related records. The Hennepin County Dispatch Center reported that at the corresponding date and time, Allen Michael King (DOB: 10/04/1995) was issued a traffic citation and his brother, Michael Valentino King (DOB: 3/28/2000), was arrested for an outstanding warrant. Allen King's Minnesota driver's license photograph was compared to the image of the user of the "Bullykapper Bubba" Facebook account and law enforcement determined that the images appeared to be of the same person.

41.     A review of the publicly available timeline on Allen King's "Bullykapper Bubba" Facebook page showed various postings suggesting that King, Stevenson, and other associates from Minnesota were included in the group that vandalized Charlie's 10th Hole Bar and burglarized the CVS. First, and as depicted below in Figure #12, King posted that he was with the individuals associated with the Facebook accounts "La Dave Llbd" [ID #100046596046244] and "Get Emdone" [ID #100050512601056] on August 24, 2020 at 3:30 pm.   Specifically, King indicated that he and these other two individuals were on a "money mission." In a "comment" appended to that same posting, King tagged another account, "SF Kevin vs Bullyloc" [ID #100006833267125], and wrote: "twin we woke up on mission." The "SF Kevin vs Bullyloc" account responded by writing "Factz." Law enforcement knows that it takes approximately five hours and thirty minutes to drive from the Twin Cities area in Minnesota to Kenosha, Wisconsin, such that the timing of this post is consistent with the arrival of King's group near the Stella Hotel in Kenosha at approximately 9:30 pm on August 24, 2020.



*Figure 12 – King Facebook Post and Comment Regarding "Money Mission"*

42.     Then, a few minutes later, King posted a link to a news article related to the officer involved shooting in Kenosha, Wisconsin, as depicted below in Figure #13.



*Figure 13 – King Facebook Post Regarding Kenosha Shooting*

43.     Allen King's next Facebook post was a video on his timeline at 9:52 pm on August 24, 2020, in which he announced that he and his group were in Kenosha, Wisconsin. Law enforcement downloaded this video and observed that it depicted civil unrest.  Figure #14 below is a still image of Allen King, derived from this same video, wearing a red shirt and another shirt over his head and face, with just his eyes visible.



*Figure 14 – Still from King Facebook video taken in Kenosha*

44.     Allen King is also seen in this same video with a heavyset black male wearing a red shirt with "Tom and Jerry" graphics, depicted below in Figure #15.  The video then pans to show that King was walking with a larger group that included a male in an orange shirt and another male in a yellow sweatshirt.  Additionally, King captured images of a black female with frizzy hair, as depicted in Figure #16.  The image of the black female in Figure #16 is consistent with it being Stevenson, and also consistent with the female intruder inside the CVS depicted in Figure #3.



*Figure 15 – Heavyset black male wearing Tom and Jerry graphic t-shirt walking with Allen King in Kenosha, Wisconsin on August 24, 2020*



*Figure 16 – Kannasysha Stevenson walking with Allen King*
*in Kenosha, Wisconsin on August 24, 2020*

45.     Later in the video, King is heard encouraging someone to open a building and start it on fire, but it is unknown if such action was taken.  Further along in the video, King is seen walking next to a black male wearing a dark hoodie, light facemask, light colored shorts, and white shoes, similar to the shooting suspect from Charlie's 10th Hole bar (see Figure #17).  Near the end of the video, King and Stevenson are seen walking back towards a

black SUV when King is heard repeating an unknown third party's admonition that, "We need to steal so we can start crashing through shit."



*Figure 17 - Male wearing face mask, dark hoodie, light colored shorts, and white shoes*

46.     A further review of King's Facebook page revealed he posted an image of himself and another person wearing the same outfit on August 27, 2020, as depicted below in Figure #18. King "tagged" the account "SF Kevin vs Bullyloc" in this picture and again referred to this person as his "twin." Based on this "tag," it appears as if the user of the "SF Kevin vs Bullyloc" account is a thin, black male with long dreadlock hair.  Based on (i) the consistency between the

appearance of the shooter at Charlie's Bar and the appearance of the user of the "SF Kevin vs Bullyloc" account; and (ii) the August 24 posting wherein the user of the "SF Kevin vs Bullyloc" account affirms that he is on a "mission" with King on August 24, 2020, law enforcement believes that the shooter at Charlie's Bar is the user of the "SF Kevin vs Bullyloc" account.



*Figure 18 – King Facebook Post With "SF Kevin vs Bullyloc"*

47.     On August 28, 2020, the Honorable Mary Wagner, of the Kenosha County Circuit Court, signed a search warrant for the historical location information associated with Moore's cell phone number. The listed subscriber for Moore's cell phone number appears to be one of the same people that Moore communicated with during jail calls. A preliminary review of this same location information showed that Moore's phone traveled from Minnesota to Kenosha on or about August 24, 2020, leaving the Twin Cities area at approximately 2:00 pm and arriving in the Kenosha area at approximately 8:50 pm. Moore's cell phone was then stationary in Kenosha for several hours, including at the time of the arson. (He was arrested on August 24, 2020 at approximately 11:59 pm.) On August 25, 2020 at approximately 12:22 am, Moore's cell phone returned from Kenosha to Minneapolis, Minnesota, arriving at approximately 6:00 am (while Moore was in custody). On August 25, 2020 at approximately 5:21 pm, the cellular device appeared to have powered off.  Based on this course of travel and the aforementioned jail call wherein Moore directs a third party to retrieve his personal effects from his Facebook friend "Anthony Clay," law enforcement believes that (i) Moore and Clay were in Kenosha together the evening of August 24, 2020; and (ii) Clay became in possession of Moore's personal effects because Moore stated during his interview that he had left his cellphone (and likely other items) in the Dodge car.

48.     On October 20, 2020, ATF Special Agent Rick Hankins downloaded Facebook records for "Anthony CLAY" (ID #100009171689529) pursuant to a federal search warrant. "Anthony Clay" is a black male later identified as Anthony Deshawn CLAY (DOB: 10/15/1997). The Facebook records for CLAY were inventoried as ATF Item #17.

49.     The booking photograph of Anthony CLAY from the Minneapolis Police Department was compared to images depicted on the aforementioned "Anthony Clay" Facebook page, and the images appeared to be the same person.

50.     The following is a summary of information obtained from CLAY'S Facebook records:

51.     On August 24, 2020, at 11:57 am, CLAY sent the following message to Facebook username "La Dave Llbd," a.k.a. David GARNER, "Finna be On my way! Getting oil changed". On this same date, at 1:16 pm, CLAY voice called GARNER via Facebook.  On August 24, 2020, at 1:06pm, CLAY attempted to video chat with Facebook username "Backdooe JQ," a.k.a. Jaquan MOORE.

52.     On August 24, 2020, at 1:17 pm, CLAY sent the following message to Facebook username "Deon Nolove Sanstad" (ID #100000527103396): "Let's go puss."  Sanstad replied, "where we going", and CLAY wrote, "Wisconsin."

53.     On August 24, 2020 at 1:46 pm, GARNER received the following message from CLAY: "Here."  GARNER and CLAY then had a Facebook video chat at 1:49 pm.

54.     On August 24, 2020 at 7:33 pm, Facebook username "Davion Williams" (ID #100024410731607) sent CLAY the following message: "what city yall in," to which CLAY replied, "Almost to Milwaukee." At 7:36 pm, Williams wrote to CLAY: "stop at the next gas station . . . we need to grab gas."

55.     On August 25, 2020 at 12:28 am, CLAY posted a video (ID #2615722925410071) from inside a vehicle that showed crowds of people outside the vehicle. The video included a printed statement "Wisconsin going crazy," as depicted below.



WISCONSIN GOING CRAZY

56.     On August 25, 2020 at 12:53 am, CLAY posted a video (ID #225461565528689) from inside a vehicle that was traveling northbound on Interstate 94 as the vehicle approached the Marquette interchange in Milwaukee, Wisconsin, as depicted below.



57.     ATF previously obtained a Google reverse location search warrant for potential

devices inside or near the Stella Hotel & Ballroom located at 5706 8th Avenue, Kenosha,

Wisconsin on August 24, 2020. Google subsequently responded to the search warrant and

provided information regarding multiple devices that were in a prescribed area near the Stella

Hotel & Ballroom between 9:25 pm and 9:45 pm on August 24, 2020. The devices included

device # -1126896735, which is a device associated with username David GARNER.  Google

also provided a Google Subscriber Information sheet for GARNER that showed a Google Account ID, also known as a Google Advertising ID, number for GARNER to be 6282528440811.

## CONCLUSION

58.     Based on the foregoing, I request that the Court issue the proposed search warrant.

59.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Google.  Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

**<ins>ATTACHMENT A</ins>**

**<ins>GRAND JURY MATTER NO. 2020R00324</ins>**

**Property To Be Searched**

This warrant is directed to Google LLC and applies to:

(1) Location History data and all geofence advertising location data associated with

Google Advertising ID or Google Account ID (GAID) #628252840811 for the

following time period:

from August 24, 2020 at 12:00 pm (CST) to August 25, 2020 at 6:00 am (CST)

<u>**ATTACHMENT B**</u>

**I.   Information to be disclosed by Google**

The information described in Attachment A, via the following process:

1.  Google shall query location history data for GAID #628252840811 as described in

    Attachment A.  The location data should be sourced from information including GPS

    data, cellular data, and information about visible wi-fi points and Bluetooth beacons

    transmitted from devices associated with GAID #628252840811 during the following

    time period:

    from August 24, 2020 at 12:00 pm (CST) to August 25, 2020 at 6:00 am (CST)


2.  The location data should include latitudinal and longitudinal coordinates, dates, and

    times for GAID #628252840811 for the above referenced time period.